### WILLIAM A. FRYE *versus* JOSEPH M. MOOR *& al.*

Where the defendants caused an unnatural accumulation of water in a reservoir above the millpond whence the plaintiff and defendants draw the water to propel their respective mills, and subsequently let it pass into its ordinary channel over the plaintiff's flume; — *Held,* that, if the water was rightfully accumulated, the defendants must exercise ordinary care in letting it out; but if it was retained without legal authority as to the plaintiff, they let it out at their peril.

If the plaintiff's flume was sufficient to withstand the pressure of the natural freshets, it will be no defence that the flow caused by the defendants did not exceed in magnitude some of the accumulations of water arising from natural causes.

A verdict, being an entirety, cannot be set aside as to one count, and retained as to another.

ON MOTION to set aside the verdict as against the weight of evidence, &c.

It appeared that the water which propelled the plaintiff's gristmill and also the defendants' sawmill, was raised by a dam across Sebasticook river, the outlet of, and one hundred rods below, Newport pond; that, in 1854, the defendants erected a reservoir dam directly at the outlet of the pond, the object of which was to produce a flow of water for preservation and use during the season of drought; that the reservoir dam was the defendants' property and under their entire control; that the effect was to flow the shores of the pond to the injury of abutters, causing much complaint

from them at times. At the same time, the large amount of surface thus flowed, from 5000 to 7000 acres, and at the depth of about three feet above its natural level, produced a vast accumulation, which, moderately expended, furnished water sufficient for the season's supply. Care had been taken to so construct the dams, both at the mills and at the outlet, as to meet the contingencies of flood and drought by waste ways and flash boards.

The plaintiff's mill was driven by water taken from the lower dam by a flume.

Early in the season of 1862, the defendants shut down the gates of the reservoir dam, causing a large accumulation of water in the pond. Land owners called for damages for flowage. Plaintiff refused to contribute towards paying said damages, when the defendants notified the plaintiff they should let out the water, and did so, thereby causing the injury sued for in this action.

The verdict was for the defendants, and the plaintiff moved it be set aside as being against evidence.

*Whitney & Paine*, for the plaintiff.

*J. A. Peters*, for the defendants.

TAPLEY, J. — The defendants caused an *unnatural* accumulation of water in a reservoir above the mill of the plaintiff. If accumulated rightfully as to this plaintiff, they must at least exercise ordinary care in letting it again pass into its ordinary and accustomed channels over the plaintiff's property. If accumulated wrongfully and without any right or authority as against this plaintiff, if he lets it into its ordinary, and accustomed channels, he does so at his peril, and he must be held responsible for the consequences of his *wrongful* act.

The present accumulation was caused by closing the gates to aid in passing some logs down the stream a short time before the injury occurred. The day of the injury, and a few hours before it occurred, one of the defendants notified plaintiff, that, by directions of his father, (the other defend-

ant,) he should let the water out of the pond if the plaintiff would not pay his proportion of the money for flowage around the pond. The plaintiff refused to pay, and the defendants caused it to be let out by opening *all* the gates in the dam by which it was retained.

Before it reached the plaintiff's property it passed into another reservoir, with which the plaintiff's flume was connected at the lower dam. At this time there were three other places than the plaintiff's flume in the dam, through which the extra *amount* of water might have been safely passed by the defendants, and the danger to plaintiff's property avoided. These places were the "tannery waste way," and the "log sluice and waste way," which the defendant says would vent *more* water than the two gates could supply. The "tannery waste way" was planked up within two feet of the top of the dam, and "the log sluice and waste way were all planked up within three or four inches of the top of the dam." "There was no escape for the water except through the flume or over the dam."

The defendant, George L. Moor, says he told Libby "to go and open the gates, and regulate *the water* on the lower dam *by letting it off through the sluices*," thus clearly recognizing, himself, the *necessity* of giving it other vent than through the plaintiff's flume. Libby *neglected* to do it, and let all the accumulated waters down upon the plaintiff's property, taking *no precautions* to prevent the injury, which almost necessarily and inevitably followed, showing not only a want of ordinary care on his part but gross carelessness, for which the defendants, whose agent he was, and under whose directions he was acting, are responsible. The result was, the plaintiff's flume was injured by the passage of the accumulated water.

These facts are *indisputable*, and *clearly apparent* from the evidence.

To this the defendants present two defences.

1st. That the plaintiff's flume was weak and improperly constructed.

Frye *v.* Moor.

The evidence shows that it was sufficient for all *ordinary contingencies* and flow of water, and sufficient to withstand the pressure of the *natural* accumulations, whether in the one season of the year or another ; and if it was weak and known by the defendants, as they assert, there was so much more need of *care* in letting on more than the ordinary pressure of water.

2d. It is said that thus opening the gates did not let down more water than had at times before been seen during the spring freshets. That " the water ran over the dam in the spring freshet of 1862."

This defence assumes the right upon the part of the defendants to create a freshet whenever they please, without incurring responsibility for the injuries it produces, provided it does not exceed in *magnitude* some which have arisen from *natural* causes. Such a defence cannot prevail, and we understand the jury were distinctly so instructed.

The verdict is *manifestly against the evidence, and the weight of evidence and the law applicable thereto.*

No testimony or evidence has been presented to us applicable to the second count in the writ, and defendants' counsel ask that the verdict shall not be set aside as to that count.

The *verdict* being an entirety cannot be *set aside* as to one count, and *retained* as to another. There cannot be more than one *general verdict*, in a case upon which to render judgment. If the verdict was for plaintiff, and was in this particular right, but there was an erroneous assessment of damages, upon a motion for new trial on account of excessive damages, there would seem to be no difficulty in sending the case back for a new assessment of damages alone. Cases may also arise upon exceptions, where the erroneous ruling was *entirely* upon the rule of damages in the case ; but the case at bar does not call for a decision of this question and does not present a case where it is practicable to exercise such a power.     *Motion sustained.*

*Verdict set aside and new trial granted.*

APPLETON, C. J., CUTTING, KENT, DICKERSON and BARROWS, JJ., concurred.