Scribner, J.
The plaintiff, the City of Fremont, is a municipal corporation, which bad by the federal census of 1880, a population exceeding 8,000, and not exceeding 10,000. Prior to the year 1882, it was, and-ever since has been, and still is, the owner in fee-simple, and in possession of the following described lands and tenements, to-wit:
Out-lot one hundred and eighteen (118); east part of out-lot thirty-one (31), and the east part of the north part of out-lot thirty-three (33), in the said city of Fremont, Sandusky county. These lands are situated upon and along the western bank of the Sandusky river, an unnavigable stream, and have a river frontage of from 2,000 to 2,500 feet.
In the year 1882-3 the city constructed, and has ever since maintained, upon said lands and near the bank of the river, a system of water-works, consisting of buildings and-otiher structures, reservoir, pipes and machinery, for the purpose of supplying the city with water. The reservoir so constructed comes to within twenty-five or twenty-eight feet of the water in the river. The city now has a population of about 9,000. It is provided with a system of sewerage with which numer *126 ous privy vaults and cess-pools are connected. The citizens are wholly dependent upon the water furnished by the water-works for the cleansing and flushing of the drain-pipes and sewers so used. The city is also dependent upon the water provided by the water-works for extinguishing fires.
At and prior to the year 1885, the defendants, Henry and Daniel Koons, were the owners of certain mill property situated northerly and below the said water-works property of the plaintiff, with an easement or right to flow water back in. said river for the wants and requirements of said mill only, and a dam which creates a pond and flows the water back on plaintiff’s land, and has been accustomed thus to flow for a period of from fifty to sixty years last past.
On May 6, 1887, the said Henry and Daniel Koons, then being the owners, as above stated, of said mill property and its appurtenances, entered into the following contract with the trustees of said water-works :
“ Agreement made and entered into in duplicate this 6th day of May, A. D. 1887, by and between Daniel Koons and Henry Koons, parties of the first part, and C. F. Reiff, James W. Moore, and G. A. Perrine, as trustees of the water-works of the city of Fremont, Ohio, parties of the second part:'
“ Witnesseth: That for and in consideration of the payment by said second parties and their successors in office, of the sums of money hereinafter mentioned, said first parties do hereby give, grant, bargain, sell, and convey unto said second parties and their successors in office forever the right and privilege to draw and take from the slack water, in the San-dusky river, above the dam,, of said parties of the first part across said river in said city, all water which said second parties and their successors may deem necessary for fire and other purposes; and any and all connections with said river by pipe or otherwise, as may be necessary to accomplish such purposes, may be made by said second parties and their successors at any point on said river not farther down stream *127 than the north line of any land hereafter owned or used for water-works purposes.
“ In consideration of the privileges and rights hereinbefore conveyed to them, said second parties for themselves, and their successors in office, hereby agree and biud themselves, as such trustees, to pay to said first parties and their heirs and assigns the sum of one hundred dollars, each and every year after the date hereof in which they shall maintain such connections as aforesaid.
“ If from any cause said first parties and their heirs and assigns should permanently cease to maintain said dam, then the liability to make such payments as aforesaid shall immediately cease and determine. In witness whereof the said Daniel Koons and Henry Koons, and the said trustees, have hereunto set their hands.
“H.R. Koons, G. A. Perrine,
“ Daniel R. Koons. J. W. Moore,
“ C. F. Reife,
“ Trustees of the Fremont Water- Works.”
This instrument was delivered for record to the recorder of Sandusky county, October 1, 1890, and was by him recorded in the Lease Records of said county, October 6, 1890. It was approved by resolution of the council of the city of Fremont, August 22, 1887.
Ry virtue of the contract so entered into, the water-works trustees, in the year 1888, laid a pipe about ten inches in diameter, and from thirty-five to forty feet long, upon the said land, from the slack water in said river above said dam to said reservoir, for the purpose of conducting water from said river to said reservoir, for the uses before mentioned. This pipe does not project beyond the edge of the bank into the river, and is laid at such a height above the bottom of the stream at that point as to leave about twenty-four inches of water below its mouth. It is about two feet below the surface of the water when it is at its ordinary stage. This pipe *128 has been maintained and used by the plaintiff continuously down to the present time. Subsequently, a second pipe was laid, which is substantially on a line with the bottom of the river.
The city uses, by means of its water-works, about a million gallons of water per day. Of this quantity about one-half comes from the river; the remainder from other sources. The demand for water is constantly increasing.
The defendants, Daniel and Herny Noons, on September 15, 1885, executed to the defendants, June & French, a mortgage upon the entire mill property above mentioned to secure the payment of an indebtedness of $5,000.00, payable five years from September 15, 1885, with interest. This mortgage was duly recorded September 17, 1885. It was executed and recorded prior to the date of the execution of the contract between the Noons’ and the water-works trustees above set forth. The mortgage debt matured, if days of grace be not considered, on the 15th day of September, 1890.
On August 18, 1887, the said Daniel and Henry Noons executed to the First National Bank of Fremont a second mortgage on the same property, to secure the payment of a debt of $9,954.83. This mortgage was recorded on the same day of its execution. It was sold and transferred by the bank to the defendants, June & French, March 22, 1890, for the sum of $9,000.00.
On December 8, 1890, the said Daniel and Henry Noons conveyed by deed of general warranty the said mortgaged premises to the said June & French, the consideration being $14,954.83, the amount 'then due on said two mortgages. These mortgages were not cancelled. The grantees had no knowledge, at the date of said conveyance, of the execution or existence of said contract of May 6, 1887, between the said water-works trustees and the said Henry and Daniel Noons; or that the city had taken water from said river. Nor had the bank, at the date of the execution of its said mortgage, any knowledge thereof.
*129 About June 15, 1891, the defendants, June & French, notified the plaintiff in writing to cease taking water from the river for its water-works purposes.
About June 26, 1891, said June submitted to the council a proposition to sell the said mill property to the city. This proposition was not favorably considered by the city.
Somewhere from the 24th to the 27th of July, 1891, the defendants, June & French, or one of them, removed, or procured to be removed, a portion of the dam forming part of said mill property. This, it is alleged by the plaintiff, was done unnecessarily and maliciously under pretense of repairing said dam, without any intention on their part of abandoning their said easement, and for the sole purpose of injuring the plaintiff, and cutting off its supply of water from said river. The defendants, June & French, admit the tearing out by them of some of the planks forming part of said dam, but deny that it was done with the intent and for the purpose charged by the plaintiff. They allege that it was done for the sole purpose of making necessary repairs. They also deny that the plaintiff had any right to take water from the stream.
The city brought its action in the court of common pleas against the defendants herein, to enjoin them from interfering with the plaintiff' in the use of water from said river, in the manner and for the purpose stated; and they pray that the right of the plaintiff’ to take water as aforesaid may be quieted as against the defendants.
The original pétition was filed July 27, 1891. A preliminary injunction was allowed as prayed for in the petition on the same day. Answers were filed by the defendants, taking issue upon many material allegations of the petition. The case was tried at the January term, 1893, of the court of common pleas, and the injunction dissolved and the petition dismissed. .From this judgment plaintiff appealed. In the circuit court amended pleadings were filed, upon which the case has been carefully tried before us. A large *130 amount of testimony was introduced and full arguments made on this hearing, and I now proceed to announce the conclusion reached by us after a somewhat laborious investigation of the interesting questions presented and numerous authorities cited by counsel in oral arguments and in their briefs.
1. Without stopping now to consider the question as to the power of the trustees of the water-works to enter into the contract of May 6, 1887, with the mill owners, Daniel and Henry Koons, we proceed at once to inquire as to whether or not, under the admitted facts and the testimony, such contract is legally sufficient in form and effect to accomplish the purpose intended by its execution. So far as Daniel and Henry Koons are concerned, we have no doubt upon this question.
The grant or concession of the right to use the slack water is clearly expressed; it was made upon a stipulated consideration which has been regularly paid ; it has been acted upon by the trustees, apparently in good faith, and without question by either of the original parties.
It is as to the mortgagees and grantees of the mill property, with its easement and appurtenances, they having no knowledge or notice of the contract, or of the taking of water under it by the trustees at the time they acquired their rights, that the serious question arises.
It is claimed in their behalf, that the right or interest sought to be conferred upon the trustees by the contract mentioned is of such a nature that a duly executed and acknowleged instrument, or deed of conveyance, is necessary to effect such transfer, and that as to them the writing relied upon is wholly inoperative.
The right to take water from the river, mentioned in the contract, it will be observed, is limited by its terms to “ the slack water in the Sandusky river above the dam.” As to the water at its ordinary stage, when its flow is unobstructed by a dam, the plaintiff, as a riparian owner, would have the same *131 right to take water from the river as the defendants. The mill owners are invested with an easement, appurtenant to the realty, which is correctly stated to be a “right to flow water back in the river for the wants and requirements of the mill only, and a dam which creates a pond, and flows the water back on the lands of the plantiff and others.”
This easement does not create in the mill owners any actual ownership in the slack water. They may not sell or otherwise dispose of it. They have the right, simply, to use it for their mill purposes, and it is their duty then to permit it to pass to the stream below. That is, they have no right to dam the stream, and entirely cut off the flow of water to land owners below.
By the contract of May 6, 1887, there was, then, no grant of an easement to the trustees. There was a mere giving up or relinquishment on the part of the mill owners of their right to use, to a certain extent, the slack water which might accumulate above the dam. This view is very clearly stated by Lord Chief Justice Tindal, in the case of Liggins v. Inge et al., 7 Bingham, 682, the syllabus of which is as follows: “Plaintiff’s father, by oral license, permitted defendants to lower the bank of a river and make a weir above plaintiff’s mill, whereby less water than before flowed to plaintiff’s mill; Held, that plaintiff could not sue defendants for continuing the weir.” In the course of his opinion the Lord Chief Justice said :
“We do not, however, consider the object, and still less the effect of the parol license, to be the transferring from the plaintiff’s father to the defendants any right or interest whatever in the water which was before accustomed to flow to the lower mill, but simply to be an acknowledgment, on the part of the plaintiff’s father, that he wanted such water no longer for the purposes of his mill, and that he gave back again and yielded up, so far as he was concerned, that quantity of -water which found its way over the weir or fletcher, which he then consented should then be erected by the defendants. And we *132 think, after he has once clearly signified such relinquishment, whether by words or act, and suffered other persons to act upon the faith of such relinquishment, and to incur expense in doing the very act to which his consent was given, it is too late then to retract such consent, or to throw on those other persons the burthen of restoring matters to their former state and condition.”
According to this view, the contract of May 6, 1887, did not have the effect of transferring to the trustees representing the city any right or interest in the water, but operated as an acknowledgment on the part of the mill owners, that they no longer required all the slack water for the purposes of the mill, and that they surrendered to the city, one of the riparian owners above, a portion of such slack water.
The views above quoted from the opinion of Lord Chief Justice Tindal are directly in accord with the current of authority touching the requirements of a release or surrender of an easement. It is well settled that an easement can only be created by deed or by prescription, which, it is said, presupposes a deed.; as to the application of the doctrine of estoppel, in such cases, see Cooley on Torts, pages 310-11, and authorities there cited, and Sixth American & English Encyclopedia of Law, 143, note.
It seems clear, however, upon authority, that an 'easement may be surrendered or relinquished by parol, or may be abandoned.
“ An easement in real estate,” said Gray, Judge, in Curtis v. Noonan, 10 Allen, 406, 409, “ can be acquired only by a deed, or by prescription, which presupposes a deed; but it may be destroyed or extinguished, abandoned, or renounced, in whole or in part, by a parol license granted by the owner of the dominant tenement, and executed upon the servient tenement,” citing Dyer v. Sanford, 9 Metcalf, 402; Morse v. Copeland, 2 Gray, 304, 305.
In the present case, the license, so called, was granted by the Noons’, the owners of the dominant tenement, and was *133 executed upon the property of the city, the servient tenement.
See, to the same effect, cases cited in the note, 6th Amer. & English Encyclopedia of Law, page 148, where it is said : “ It is true, as a general rule, that an interest in real estate cannot be conveyed except by deed; but is well settled that an owner of a right of way or other easement may, without deed, abandon his right so as to release the servient estate of the encumbrance.” See, also, Moak’s Underhill on Torts, page 442 et seq.
In this case there is no surrender of an easement. The right to maintain the dam, to flow water back in said river, and to use the same in operating the mills of the owners remains intact. As before shown, there is relinquished to the trustees the right to use a portion only of the slack water accumulated above the dam. We think this may be done by a mere writing, such as was executed in this case.
2. To what extent are June & French, the purchasers of the mill property, affected by the contract in question ?
On December 8, 1890, the then owners, Henry and Daniel R. Noons, for the consideration of $14,954.83, being the amount then due upon the two mortgages before described, conveyed to the defendants, June & French, all said mill property. This conveyance being subsequent in date to the contract of May 6, 1887, between the water-works trustees and the grantors therein,' and the exercise by the trustees of the privileges provided for therein, cannot, upon well settled principles, affect whatever rights may have been acquired thereunder. Equity, however, will interpose to prevent a merger of the mortgages, and will preserve them intact for the protection of the purchasers. But the second mortgage was executed in August, 1887, and is, therefore, subsequentin date to the contract with the trustees. Under the views entertained by us, the rights, whatever they may be, arising under this contract, are not affected by the last mentioned mortgage. The first mortgage bears date September 15, 1885, *134 and was recorded two days later. This instrument, therefore, takes precedence, and the contract of the trustees is subject thereto. The defendants, June & French, notwithstanding the conveyance to them, maybe regarded as mortgagees in possession, and if it shall appear that their interests as mortgagees under the mortgage of September 15, 1885, are substantially affected by the exercise of the privileges provided for in the contract in question — that their security is depreciated, or put in jeopardy thereby, then, to that extent, they are entitled to relief.
We are unable to find from the testimony, however, that any such injury has occurred or is threatened. The mortgage debt is $5,000; the consideration paid for the property was $14,-954.83. The first pipe was put in in 1888; the second pipe was laid subsequently. The city has continuously made use of the water flowing through these pipes from the slack water ever since they were laid. It does not appear that this use interferes to any considerable extent with the operations of the mill; certainly not so as to imperil the security of the $5,000 debt covered by the mortgage of September, 1885. The defendants, June & French, therefore, are not, in this proceeding, entitled to affirmative relief as against the city, unless it be held that the trustees had no authority to enter into the contract under which the slack water is taken by them, and that the action of the council assuming to ratify such contract is ineffectual to that end.
3. It is insisted on the part of the defendants that the trustees of the water-works were entirely without power to enter into the contract with the Koons’ of May 6, 1887, and that their attempted action in that regard is wholly void.
In this connection it should be borne in mind that in accordance with the views above expressed by us, the contract in question amounts simply to a surrender by the mill owners of their right to use a portion of the slack water above the dam, and a promise on the part of the trustees to pay the sum of $100.00 annually for such surrender. We think full and *135 ample power to enter into such an agreement is conferred on the trustees by the statute; Rev. Stat., secs. 2409-2415. Section 2415 provides as follows: “The trustees or board shall be authorized to make contracts for the building of machinery, water-works, buildings, reservoirs, and the enlargement and repair thereof, and the manufacture and laying down of pipe, and the furnishing and supplying with connections all necessary fire hydrants for fire department purposes, and keeping the same in repair, and for all other necessary purposes, to the full and efficient management and construction of water-works.”
The powers conferred by this section seem full and ample. See opinion of this court in the case of State ex rel. v. Griffin, 4 O. C. C. R. 156. If the act of March 2, 1882, 79 Ohio Laws, 15, be free from constitutional objection, — a matter upon which we express no opinion, as no question is raised with respect to it, the conclusion above stated is thereby greatly strengthened. Secs. 3 and 6 of that act seem to expressly provide for a contract of the character now under consideration. By sec. 3 it is declared “that no contract or agreement entered into or 'obligation incurred, or expenditure authorized by the trustees for and on account of the management, conduct, or repair of the water-works, shall be binding upon any such city, except as being payable out of such receipts from the water-works, as by this section are placed at the disposal of the trustees, or being first approved by council out of any funds which council may provide for the purpose of meeting such costs and expenses, should the total receipts from the water-works prove insufficient therefor.” Section 6 enacts as follows : “No contract or agreement entered into, or obligation incurred or expenditure authorized by the trustees of the water-works, for or toward the construction, enlargement or extension of the water-works, or for changes therein except for necessary repairs, or in any way relating to the water-works or to anything incident or appurtenant thereto, *136 shall be binding upon any such city, nor shall any money be appropriated or drawn from the treasury of the city to execute any such contract or agreement, or to discharge any such obligation, or defray any such expenditure, unless before going into operation the same is ratified by the council; provided that this section shall not apply to the necessary costs and expenses of managing, conducting and repairing such water-works after the same have been put in operation
The water-works of the city of Fremont were erected and put in operation in the years 1882 — 3. They have ever since been under the care and management of the trustees provided for by the statute. We think the powers conferred by statute on these agents of the municipality are amply sufficient to enable them to enter into contracts, such as that of May 6, 1887; but if any doubt should exist as to the authority of the trustees in this regard, the contract is fully validated by the action of the council approving it by resolution adopted August 22, 1887.
4. Upon the foregoing views of the law, what are the rights and duties of the parties in the pending proceeding V That at or before the date of the commencement of this action, the defendants June & French were engaged in removing or causing to be removed portions of the dam, and thereby permitting the water from above to escape to the bed of the stream below, clearly appears. It is alleged on the part of the defendants that this was being done for the purpose of enabling them to make necessary repairs to the dam. That repairs were necessary, is manifest from the testimony. The plaintiff asserts and gave proof tending to show that it was not necessary in order to make the proper repairs to so tear out the dam as to permit the escape of the water to any considerable extent; that by the acts of'the defendants complained of the city was entirely deprived of its accustomed water supply from the river, and that by means thereof the citizens were exposed to an outbreak of disease, and the public and private *137 buildings of the city became liable to injury and destruction from fire.
Upon a careful consideration of all the testimony submitted to us upon this branch of the case, we are of opinion that the method adopted by the defendants in letting the water out of the dam for the purpose of making needed repairs, was a reasonable and proper one; but that, under the circumstances, this work should not have been entered upon until due and ample preparation had been made for the prompt and vigorous prosecution and speedy completion of the work of making such repairs. From the proof submitted, we are led to the conclusion, and so find, that this preparation had not been made. Indeed, the testimony tends strongly to show that the purpose was to coerce the city into purchasing the mill property from the defendants, they asserting that the city had no right to take water from the river for water-works purposes.
Upon the question so arising I quote the following: “The owner of a mill and dam has a right to the reasonable use of the water, but he must detain it no longer than is necessary for its profitable enjoyment, and then return it to its natural channel. A wanton or vexatious, or unnecessary detention would render the mill owner so detaining liable to damages to those injured by such unlawful detention.” Phillips v. Sherman, 64 Me. 171, 174, and cases. The above case, it will be seen, presents the converse of the proposition arising here. In Fry v. Moor, 53 Me. 583, it was held “ that if the water be rightfully accumulated the defendants must exercise ordinary care in letting it out.” See also the Maine case of Stevens v. Kelley, Jr., 3 N. E. Rep. 231; 18 Weekly Law Bulletin, 41.
We conclude, therefore, that the plaintiff is entitled to an injunction, under the circumstances as they are shown to exist, restraining the defendants from tearing out or destroying the mill-dam in controversy, unless they shall determine to abandon the same. This judgment is based upon the findings *138 before made, namely, that the defendants had not made due preparation for the prompt and speedy reconstruction of the dam, and also upon the fact, undisputed in the case, that it is not the purpose of the defendants to abandon the dam, or the easement connected therewith.
Bartlett & Wilson, Garver & Garver, Finefrock & Garver, Meek & Dudrow and James Hunt, for plaintiff.
C. P. Wickham, James H. Fowler, and Horace S. Buckland, for defendants.
5. We cannot grant the prayer of the plaintiff’s petition to adjudge null and void as to the plaintiff the interest of the defendants in said mill property and its privileges. We have already stated that the mortgage of 1885 is prior in right to the privileges ceded to the city. That the latter is clothed with the right to draw from the slack water, subject to the liens and rights acquired by the defendants under the mortgage of 1885, we also find. The precise extent to which water may be taken by the city we do not now determine. But in view of the circumstances existing when the contract in controversy was executed, we do not hesitate to say that the privilege to take water under its terms is not unlimited. It contains the following language, granting “the right and privilege to draw and take from the slack water in the Sandusky river above the dam * * * all water which said second parties and their successors may deem necessary, for fire and othér purposes.” This Janguage should not be so construed as to operate to the destruction of the defendants’ easement, or to deprive them of so much of said slack water as is necessary for the operation of their mill machinery adapted to and connected with said water power. But the further consideration of this question, and questions of a kindred nature, must be deferred until they properly arise.
A decree will be entered embodying the conclusions here expressed.