CENTRAL MAINE POWER CO.
RE: INCREASE IN RATES

CENTRAL MAINE POWER CO.
*vs.*
PUBLIC UTILITIES COMMISSION
OF THE STATE OF MAINE ET AL.

Kennebec.   Opinion, August 16, 1960.

*Frederick T. Taintor,*
*Joseph P. Gorham,*
*Vincent L. McKusick,*
*Leonard A. Pierce,*
*William H. Dunham,* for plaintiff.

*Peter Kyros,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

SULLIVAN, J.   This case comprises two review proceedings instituted by the Company following the refusal by the Commission to allow to the Company rates which would have increased the latter's gross income some $2,794,000 and after the fixing of rates by the Commission granting a partial increase of $898,000.

The Company has filed both exceptions asserting errors in fact and in law and a petition in equity alleging confiscation of property. R. S., 1954, c. 44, §§ 67, 69.   This

court has overruled the Commission's demurrer to the petition and has ordered that both causes be entertained concurrently. A general denial in equity has been interposed by the Commission and the parties have stipulated that both controversies shall be heard upon the evidence presented before the Commission.

As for the exceptions, alleged errors of law must be adjudged exclusively by this court. Averred errors of fact are to be conceded or rejected in accordance with the presence or absence of any substantial evidence to sustain the factual findings.

*Rioux* v. *Assurance Co.,* 134 Me. 459, 465.

*Wade & Dunton, Inc.* v. *Gordon,* 144 Me. 49, 51.

*Picken* v. *Richardson,* 146 Me. 29, 32.

*D'Aoust Appellant,* 146 Me. 443, 444.

*Cent. Me. Pr. Co.* v. *P. U. C.,* 153 Me. 228, 231.

> "If a factual finding, basic of an order of the Commission, is supported by any substantial evidence, that is, by such evidence as, taken alone, would justify the inference of the fact, the finding is final."

*Hamilton* v. *Caribou, etc., Company,* 121 Me. 422, 424.

*Gilman* v. *Telephone Co.,* 129 Me. 243, 248.

The Massachusetts Legislature has succinctly defined substantial evidence:

> " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion."

*Annotated Laws of Massachusetts,* C 30 A, § 1 (6).

As for the petition in equity, this court has not hitherto had occasion to construe formally R. S., c. 44, § 69. That

statute characterizes the equity petition as an "appeal." The power of this court under the act "to review, modify, amend or annul" is reminiscent of the language of the former equity appeal law which was R. S., c. 107, § 21 (Repealed, P. L., 1959, c. 317, § 86) and which authorized this court to "affirm, reverse or modify."

R. S., c. 44, § 69 prescribes the review in ratemaking legislative cases in which the applicant utility alleges that confiscation of property has resulted to it from an order or decree of the Commission. The act is thus calculated to afford the indispensable court hearing to satisfy the constitutional property rights of the utility. By legislative mandate this court is required to supply such a hearing and

" - - - exercise its own independent judgment as to both law and facts."

The equity cause contains the Commission record of both oral testimony and printed evidence. Rulings of law by the Commission to be reviewed must be considered independently by this court.

The burden of proof at the rate hearing had rested upon the Company and it continues to lie there in the instant proceeding. R. S., c. 44, §§ 71, 35.

The legislative direction that this court "exercise its own independent judgment as to - - - facts" places the court at no noteworthy disadvantage so far as the printed exhibits are concerned save for the specialized knowledge and superior familiarity of a Commission in utility technology and economy. But in respect to the oral testimony this court has enjoyed no opportunity to hear or observe the witnesses, particularly the experts in attenuated disagreement.

Independent judgment as to facts as a judicial technique or function in an equity review such as that obtaining here had been authoritatively evolved and been given reduced and abridged connotations by the Supreme Court of the

United States long prior to the enactment by our Legislature in 1953 of R. S., c. 44, § 69 (P. L., 1953, c. 377 § 3). We are to assume, then, that the Legislature was quite aware of such precedents in the highest court in the land when the Legislature expressly invoked a judicial process which had been scrutinized many times by the Supreme Court of the United States.

The constitutional rights to equitable review by a court utilizing independent judgment as to both law and facts in the instance of rate cases heard before an administrative tribunal had been implied by the United States Supreme Court years before the remedy was more extensively elaborated.

*Knoxville* v. *Water Co.* (1909), 212 U. S. 1, was an appeal from an equity decree of a Circuit Court of Appeals restraining the enforcement of a city ordinance fixing the maximum rates chargeable by a utility. The grievance was that the ordinance had denied a reasonable return and was confiscatory. The matter had been referred to a Master whose report had been confirmed by the Circuit Court which had found the ordinance confiscatory. The U. S. Supreme Court said at Page 8:

> " - - - In view of the character of the judicial power invoked in such cases it is not tolerable that its exercise should rest securely upon the findings of a master, even though they be confirmed by the trial court. The power is best safeguarded against abuse by preserving to this court complete freedom in dealing with the facts of each case. Nothing less than this is demanded by the respect due from the judicial to the legislative authority. *It must not be understood that the findings of a master, confirmed by the trial court, are without weight, or that they will not, as a practical question sometimes be regarded as conclusive.* All that is intended to be said is, that in cases of this character this court will not fetter its discretion or

judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. We approach the discussion of the facts in this spirit." (Emphasis supplied.)

In 1920 came the decision of the widely known case of *Ohio Valley Co.* v. *Ben Avon Borough,* 253 U. S. 287. At Page 289 the court said:

> " - - - In all such cases, if the owner claims confiscation of his property will result, the State must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment. Missouri Pacific Ry. Co. v. Tucker, 230 U. S. 340, 347; Wadley Southern Ry. Co. v. Georgia, 235 U. S. 651, 660, 661; Missouri v. Chicago, Burlington & Quincy R. R. Co., 241 U. S. 533, 538; Oklahoma Operating Co. v. Love, 252 U. S. 331."

The case of *Los Angeles Gas Co.* v. *R. R. Comm'n.* (1953), 289 U. S. 287 was an appeal from a decree of a District Court, constituted of three judges, which dismissed a bill in a suit by the appellant gas company praying that the defendant state commission and its officers be enjoined from enforcing new gas rates attacked as confiscatory. We quote from page 304:

> "4. We approach the decision of the particular question thus presented in the light of the general principles this Court has frequently declared. We have emphasized the distinctive function of the Court. We do not sit as a board of revision, but to enforce constitutional rights. San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 446. The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in

reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached; but the judicial function does not go beyond the decision of the constitutional question. *That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the Court may not interfere with the exercise of the State's authority unless confiscation is clearly established."* (Emphasis supplied.)

In *Lindheimer* v. *Illinois Tel. Co.* (1934), 292 U. S. 151, Chief Justice Hughes for the court held:

Page 164. "- - - The question is whether the Company has established, with the *clarity and definiteness befitting the cause,* that this reduction would bring about confiscation. Los Angeles Gas Co. v. Railroad Comm'n., 289 U. S. 287, 304, 305. - - - - Page 169. *"Confiscation being the issue, the Company has the burden of making a convincing showing* that the amounts it has charged to operating expenses for depreciation have not been excessive. That burden is not sustained by proof that its general accounting system has been correct. The calculations are mathematical but the predictions underlying them are essentially matters of opinion. They proceed from studies of the 'behavior of large groups' of items. - - -" (Emphasis supplied.)

In *Dayton P. & L. Co.* v. *Comm'n.* (1934), 292 U. S. 290, Justice Cardozo on behalf of the court held:

Page 295. " - - - we turn to the objections in the effort to determine whether separately or collectively they support the claim of confiscation.

"They fall into three classes: (1) objections to the computation of operating expenses; (2) objections to the valuation of the property making up the rate base; and (3) objections to the rate itself.

"First. Objections to the computation of operating expenses.

Page 298. "As to that issue *the burden of proof rests heavily on the appellant.* Los Angeles Gas & Electric Corp. v. Railroad Commission of California, 289 U. S. 287, 304, 305 - - - -" (Emphasis supplied.)

A noted decision is that of *St. Joseph's Stock Yards Co.* v. *U. S.* (1936), 298 U. S. 38. (Hughes, C. J.)

Page 53. "But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. *Judicial judgment may be none the less appropriately independent because informed and aided by the shifting procedure of an expert legislative agency.* Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of ratemaking there is a *strong presumption* in favor of the conclusions reached by an experienced administrative body after a full hearing.' Dartnell v. Edwards, 244 U. S. 564, 569. *The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established.* Los Angeles Gas Corp. v. Railroad Commission, 289 U. S. 287, 305; Lindheimer v. Illinois Telephone Co., 292 U. S. 151, 169; Dayton Power &

Light Co. v. Public Utilities Comm'n., 292 U. S. 290, 298." (Emphasis supplied.)

What satisfies the exacting demands of the Fourteenth Amendment to the Federal Constitution in the equity petition before us is necessarily and coextensively adequate to meet the imperatives here of Article 1, Sections 1, 6, 19 and 21 of our Maine Constitution. R. S., c. 44, § 71 as to the burden of proof in rate cases existed prior to R. S., c. 44, § 69 and persists contemporaneously with R. S., c. 44, § 69 without incongruity. Those truths and the hereinbefore quoted disquisitions through the years before 1953 of the United States Supreme Court are revealing of legislative understanding and intent as to the exercise of independent judgment of fact by this court in the equity petition and as to both the burden and degree of proof incumbent upon a petitioning utility.

A primary and not just a cumulative factor in the safeguarding withal of the constitutional rights of a utility in this jurisdiction derives from R. S., c. 44, § 72 which guarantees to a utility a hearing before the legislative Public Utilities Commission in accordance with judicial practice and governed by the same rules of evidence which control our trial court.

Unmistakably what our Legislature must be deemed to have understood and intended is that the court may none the less exercise the prescribed "independent judgment" as to the facts and yet in that very process be "informed and aided" by findings of the Public Utilities Commission.

Massachusetts through its court and legislature gave considerable attention to constitutional exigencies and incorporated in its statute remedying confiscatory rate making an express direction that:

" - - - The court shall give due weight to the experience, technical competence, and specialized

knowledge of the agency, as well as to the discretionary authority conferred upon it. - - -"

Annotated Laws of Massachusetts, c. 30A § 14 (8).

In resumé, then, the Company bears the burden of proof in this ratemaking controversy and there is "a strong presumption" in favor of the conclusion reached by the Public Utilities Commission, "an experienced administrative body, after a full hearing." *Darnell* v. *Edwards,* 244 U. S. 564, 569. There is for the guidance of this court "in the exercise of its judgment on the entire case" "the established principle" "that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established." *St. Joseph's Stock Yards Co.* v. *U. S.,* 298 U. S. 38, 53.

In the instant case in both causes which the Company is prosecuting the same subject matter constitutes the issues. We shall resolve each contention in its order in accordance with the recognized norms decisive of both procedures involved. The Company has precisely reduced its protests presented upon exceptions and in equity to nine in number.

The Company petitioned the Commission for a ratio of increase to its base revenue of some 7½% or an augmentation of $2,794,000 in gross revenue annually to be realized from a normalized volume of business for 1958. The return thus sought for 1958 from the full effect of the requested rates would have totaled $11,748,000. The Commission by its decree granted the Company upon a considerably pared rate base an annual rate of return of 5.75% or an additional gross annual revenue of $898,000. The Company protests error and insists that the fair return to which it is by law entitled is no less than the return which would result from the rate increase of some 7½% requested by the Company.

" - - - In determining just and reasonable rates, the Commission shall provide such revenues to the

utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms - - -"

R. S., c. 44, § 17, as amended.

"In determining reasonable and just rates, tolls and charges the commission shall fix a reasonable value upon all the property of any public utility used or required to be used in its service to the public within the state and a fair return thereon - - -"

R. S., c. 44, § 18, as amended.

At the hearing both State and Company presented expert testimony to demonstrate within the dictates of the foregoing statutes the proper rate of a fair return to the Company. Such testimony concerned itself principally with the calculation of the cost of capital of the Company. The Company has outstanding notes, bonds, preferred stock and common stock, all evidencing loans and rights of investors. The Company must provide for the marketing of more bonds, the conversion of preferred stock, the flotation of further stock, the payment of interest and dividends, the cost of financing and of embedded costs therefor and such other costs of capital as are requisite to conserve financial integrity and to attract necessary capital on reasonable terms, *Bluefield* v. *Pub. Serv. Comm.*, 262 U. S. 679, 673, 693. The witnesses agreed that the cost of capital is the gauge of what the investor exacts.

Our statutes and the decisions rendered thereunder prescribe and define a rate base of just and reasonable value and a fair return upon it. Such a rate base multiplied by a fair rate of return results in a fair return. R. S., c. 44, §§ 17, 19; *Central Maine Power Co.* v. *P. U. C.*, 153 Me. 228, 229. Determination of the "fair value" of the rate base "for rate-making purposes upon which the Company is entitled to earn a fair rate of return" is the statutory author-

ity and responsibility of the Commission to be exercised upon the evidence and within a sound discretion. *Central Maine Power Co.* v. *P. U. C.*, 150 Me. 259, 261.

For professional assistance in the complex task of fixing a fair return for the Company here each litigant supplied to the Commission the testimony of an accredited expert, one an investment banking authority, the other a public utility consultant specialist. Each testified as to capital cost. Capital cost when competently computed is essentially and practically the equivalent of fair rate of return.

> " - - - the fair return, generally speaking, is such an amount as would at the time of the inquiry induce the investment of money in such a utility." *Indiana Bell Teleph. Co.* v. *P. U. C.*, 300 Fed. 190, 201.

> " - - - Where the financing has been proper, the cost of the utility of the capital, required to construct, equip and operate its plant, should measure the rate of return which the Constitution guarantees opportunity to earn."

> *Missouri Ex Rel. Southern Bell Telephone Co.* v. *Public Service Commission,* 262 U. S. 276, 306.

The utility consultant in his testimony explained the parity between cost of debt and rate of return as follows:

> "To summarize the fair rate of return is essentially equal to the cost of capital. The cost of capital is determined in the investment markets, and reflects the extent of uncertainty involved in the particular investment, in the light of alternative investment opportunities available. Thus the competitive money markets, in their determination of the cost of capital, regulate the reasonableness of utility earnings.

> " - - - While price competition in the sale of utility services cannot be relied upon to set stable utility rates or reasonable utility earnings, competition

in the investment market (the market in which the utility must obtain its capital) steps in, via regulation, to do the job, that is, set reasonably stable rates, and reasonable utility earnings.

"On the other hand, if all or most reasonable doubts, or questions, are resolved in the direction of a higher cost rate, then the end result will be at or near the upper end of the range of a fair rate of return.

"Perhaps then the question can best be answered in terms of regulatory rather than strictly economic terms; the bare - bones cost of capital is at or near the bottom of the zone of reasonableness of fair rate of return.

"The cost of capital, as I use the term, is above the bare - bones cost, and provides, in my opinion, a sufficient margin of safety, so as to constitute a fair rate of return.

" - - - if reasonable doubts are resolved in favor of a higher rather than a lower cost of capital, the result does become equal to, and in fact may well be in the upper range of a fair rate of return.

"The cost rates I have used were, if anything, on the high side. The cost rates of debt and preferred reflect not only the full costs of each type of capital, but the cost of future capital.

"The cost rate of equity I used contains a single margin above the computed cost rate.

"The capital structure I have used is a strong capital structure, stronger than the actual one.

"Consequently, the cost rates shown - - - reasonably reflect the full fair rate of return."

The Company's investment banking expert was in agreement with the State's utility consultant as to the cost of debt and of preferred stock. The former was at variance with the latter as to the cost of equity and the investment banker's figure was the higher.

The Commission did not lack for very fulsome testimony for its findings of cost of capital or rate of return.

The Company protests that a rate of return is of itself an *a priori* figure and that no application of such percentage to any rate base was effected by the utility consultant to test the fairness of the return produced thereby. The investment banker did turn his rate of return to account but against a rate base figure provided by the Company. Neither witness had studied the Company's rate base, however, or professed to have any cultivated talent for so doing. From the very necessity of a precedent finding of a rate base by the Commission to make possible the mathematical determination of the actual rate return through the employment of the rate of return, neither witness was in a position to translate his costs of capital-rate of return percentage into any derivative money total.

Each expert in his pains credibly to realize for the Commission the interchangeable cost of capital and rate of return plied a like technique. Each was applying a practical science dependent upon a skilled judgment where by the nature of the problem precision was often not to be had. Each resorted to a comparison of the Company with other utilities esteemed to be comparable with it for the obtaining of pragmatic standards and applicable data. Earnings-price ratios, financing costs, market pressure, capital structures and competition for capital as well as the attraction of it were analyzed studiously by both witnesses. They both sought the same objectives. They heeded much the same elements. Variables had to be entertained with the constants. They differed in some respects in the importance they attributed to such factors as dividend payment, in their choice of similar utilities, in the span of time adequate for certain tests and in their appraisal of the cost of financing and of market pressure, etc.

Yet in spite of a want of absolutes both experts by independent efforts reached quite the same conclusions as to the cost of debt at 3.88% and the cost of preferred stock at 4.57% vs. 4.62%. Their results in the fixing of the cost of equity differed as 9.19% vs. 8.75%. As to the cost of financing and market pressure their reckonings were 10.6% vs. 7.5%. The Commission in the abundance of evidence submitted accepted the 7.5 percentage rather than the 10.6% as the better reasoned and defended quantity and arrived at an equity cost of 8.93% which placed the two experts in closer disagreement, such as 5.76% vs. 5.75% for the cost of capital-fair rate of return. In the intricacies of the considerations the Commission adopted 5.75% as fair.

The Company complains that against a multi-million dollar rate base a small discrepancy in percentage nevertheless entails a very tangible sum of money. Viewing the subject detachedly the criticism contains truth. Considering on the other hand the inherent possibilities of conflict of judgments in the problem of the experts the final disparity can be deemed to be quite insignificant.

We have examined the record. Upon its exception the Company can not prevail as ample evidence supports the Commission's finding of rate of return. In equity the Company has failed to sustain its onus of demonstrating confiscation or violation of a constitutional right. On the contrary the court is of the opinion that a multifold problem has been comprehensively tried and fairly resolved.

From the rate base of $206,034,000 proposed by the Company the Commission disallowed or suspended sundry items of a valuation exceeding $10,000,000 and set a rate base of $195,853,671. The Company charges that such action of the Commission was exceptionable and unconstitutional.

The directive statute is as follows:

"In determining reasonable and just rates, tolls and charges, the Commission shall fix a reasonable

value upon all the property of any public utility used or required to be used in its service to the public within the state and a fair return thereon. In fixing such reasonable value, the Commission shall give due consideration to evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the utility, less depreciation on each, and any other factors or evidence material and relevant thereto but such other factors shall not include current value. - - - -"

R. S., c. 44, § 18; P. L., 1957, c. 400, § 2.

An inspection of the foregoing law will reveal that the Commission has a duty to fix *a reasonable value* upon the property of the Company *used or required to be used in service* and that reasonable value derives from due consideration of evidence of the *cost of the property when first devoted to public use, of prudent acquisition cost* to the Company and, with the exception of current value, of any other factors material and relevant. The terminal persisting, however, as the statutory objective is reasonable value.

A fair estimation of cost of utility property when first devoted to public use or of the prudent acquisition cost of such property to a successor utility may be a rather perfunctory task or it may occasion a considerable weighing of evidence. Such costs must be original, realistic, bona fide, legitimate and within rational and sensible limitations.

The interests of the investing public and of consumers must be consulted and safeguarded. Problems can evolve. That is especially so when there are a first cost and a successive acquisition cost involved. A first cost may or may not be of aid in resolving the prudency of a subsequent acquisition cost. A successive acquisition cost can be lower than the cost to the first public utility, when, e.g., the purchase of the property by the successor utility was made at a distress sale. Capitalization of good will, of franchise value and of other intangibles demands full scrutiny. Nor is it

unthinkable that a property be given to a utility. In fine, satisfaction of the foregoing statute in all cases necessitates "due consideration to evidence of the cost" and that is no less than the exercise of a sound discretion by the Commission.

Justice Brandeis might well have been speaking of prudent acquisition cost when in commenting upon "prudent investment" he said:

> "- - - The term is applied for the purpose of excluding what might be found to be dishonest or obviously wasteful or imprudent expenditures - - -"

> *State of Missouri Ex Rel. Southwestern Bell Telephone Company* v. *Pub. Ser. Comm.*, 262 U. S. 276, 289, Note 1.

This court in commenting upon prudent acquisition cost has said:

> *"Prudent acquisition cost less depreciation.* As has been stated, this factor is intended to reflect the difference, most often an excess, between the original cost when first devoted to public service and the amount invested upon acquisition. This factor brings into focus what the Company *prudently* invested in the property and takes into account that property which is part of an established business often demands a higher price than its original cost. The Company has the burden of proving its prudence in acquiring property, for the consumer cannot be compelled to provide the utility with an income on its unjustifiable and imprudent acquisitions. - - - -"

> *Central Maine Power Co.* v. *P. U. C.*, 150 Me. 257, 266.

## ANDROSCOGGIN ELECTRIC COMPANY

The Commission has found that the Company has failed to prove the prudency of the acquisition cost in excess of

the original cost of the quondam Androscoggin Electric Company properties and consequently has suspended from the rate base valuation in this case the amount of $1,095,194.09.

Androscoggin Electric Company was organized in 1914 and purchased the assets of the antecedent Lewiston-Auburn Electric Company. At the time the cost of property in the electric plant account of Lewiston-Auburn Electric Company was $1,645,641.95. Such property was forthwith entered upon the books of the purchasing Androscoggin Electric Company at a cost of $3,840,000. The magnification in cost is not explained and must be deemed a "write-up," an over capitalization having the semblance of a purchase by a security issue and a speculation.

In 1920 by contract and through its instrumentality, the Androscoggin Corporation, the Central Maine Power Company purchased the securities of the Androscoggin Electric Company. The total contract price of the property involved in the transaction, for the purposes of the instant case, was the augmented cost which had been posted upon the Androscoggin Electric Company's books.

In 1920 the Public Utilities Commission approved the above transaction of sale and purchase of securities. The Commission in its findings was commendatory. It stated that it had not been able to make a careful valuation of the several properties affected and therefore felt:

> " - - - compelled to look about and see if the record contains sufficient information upon which we may reach a reasonably accurate conclusion - - -"

The Commission opined:

> "Feeling that we have before us all of the evidence which can be reasonably required - - -"

The Commission was mindful of the "vital" interest of the

> " - - - public, the security holders of the several companies, and this Commission as a regulatory body - - -"

The Commission concluded that the transaction of purchase bode well for service to the public, for the protection of contemporary and future security holders of the Central Maine Power Company and for the welfare of the customers of Central Maine Power Company and its allied companies.

The Commission decided:

> " - - - We, therefore, conclude and find that the value of the property to be obtained furnishes an adequate consideration for the money to be paid and the guaranties which are to be undertaken."

In 1920 and ever since the statute (P. L., 1919, c. 128) regulating the approval by the Public Utilities Commission of the issue of securities by public utilities contained as now (R. S., 1954, c. 44, § 43) the provision:

> " - - - No order of the commission authorizing the issue of any stocks, bonds, notes or other evidences of indebtedness shall limit or restrict the powers of the commission in determining and fixing any rate, fare, toll, charge, classification, schedule or joint rate as provided in this chapter; - - -"

In 1920 the law directed that a rate base be laid upon the reasonable value of the properties composing it. R. S., 1916, c. 55, § 36.

In 1935 Androscoggin Electric Company was merged into Androscoggin Electric Corporation by order of the Public Utilities Commission to effect economies and simplification and to permit the issue of additional common stock. Again the costs of the property affected was the same carried upon the books of Androscoggin Electric Company with

additions and retirements not of moment here. No issuance of securities was involved in this process, R. S., 1930, c. 62, § 44; R. S., 1954, c. 44, § 47. The Public Utilities Commission in its findings circumspectly noted:

> " - - - since the application concerns neither the issuing of securities nor the fixing of rates, we do not determine at this time what portion of the properties, franchises and permits, if any, which are the subject of consolidation, may be capitalized or may be used by the new corporation as a basis for rate making purposes."

Later in 1935 the Androscoggin Electric Corporation of which the Central Maine Power Company owned all the common stock was merged into the latter upon P. U. C. order to effect economies and simplification. The P. U. C. repeated in its findings the same admonition quoted just above and added:

> " - - - but we do reserve the right to make such determination when and as the occasion may arise."

From 1920 (R. S., 1916, c. 55, § 36) until 1953 valuation of property made for rate fixing continued to be gauged at reasonable value. But in 1953 (P. L., 1953, c. 377, § 2) the P. U. C. was instructed to consider evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the public utility, current value and any other factors material and relevant. Since 1957 current value consideration estimated by many to be impracticable as a factor has been deleted by the Legislature. P. L., 1957, c. 400, § 2. 70 Har. L. Rev. @ 982.

Thus 45 years prior to the hearing before the Commission in this case a "write-up" of properties had been introduced upon the records of Androscoggin Electric Company with Central Maine Power Company having no part in the incident.

In 1920 the Public Utilities Commission was almost laudatory in approving the Central Maine Power Company's intermediate purchase of the Androscoggin Electric Company securities. True the curb of P. L., 1919, c. 128 as to rate-making, mentioned above, was in effect always and no doubt made a legal implied condition for security purchasers and others to heed. *Sullivan* v. *Insurance Co.*, 131 Me. 228, 230. Yet the language employed by the Public Utilities Commission objectively to express its thought voices plain accord to the 1920 transaction, its prudency and economy.

In 1935 twice the Public Utilities Commission gave approbation to the progression of advancing the Androscoggin Electric Company's electric plant into the immediate ownership of Central Maine Power Company. In both latter instances the P. U. C. affirmatively adverted to the statutory reservation as to ratemaking. The caveat seems somewhat ritualistic, however, following upon the assenting orders of the Commission.

Since 1953 the Legislature has required a consideration of cost of rate base properties when first devoted to public use, prudent acquisition cost and any other considerable factors in deciding the reasonable value of those properties.

From the time of the establishment of the Public Utilities Commission pursuant to P. L., 1913, c. 129, the Legislature has adhered to the reasonable value formulary. P. L., 1913, c. 129, § 34. But neither cost of the property when first devoted to public use nor prudent acquisition cost is made synonymous with reasonable value by the statute. Nor is either of those 2 costs forced upon the P. U. C. as a substitute for reasonable value. Reasonable value as the objective of the Legislative act is not susceptive of such simple attainment. Permissively and to render reasonable value the more accessible of resolution the Legislature has prescribed attention to first cost and acquisition cost but along with

and not disregardful of the solution of a practicable, yet just, reasonable value. Given both an original and acquisition cost their comparison is often revealing in the settlement of reasonable value. These legislative determinants were not directed in lieu of but as conducive with the exercise of a sound discretion.

In this case an implacable concentration upon the write up of 45 years before can produce a drastic finding. In the quest for just rates based upon reasonable values, R. S., c. 44, § 18, the deliberation must be as careful and comprehensive as the data permit. There is no finality here but a critical inquiry into the relative equities of a host of people. Central Maine Power Company paid the total enlarged cost. There is no evidence negating an arm's-length dealing. No speculative securities were issued by Central Maine Power Company which was a stranger to the 1914 enlargement entered upon the books of the predecessor utility 6 years before the Central Maine Power Company became related with the subject matter. The property is operating and must be accepted as necessary to the public service. The Commission gave its assent as beneficial for all classes. Depreciation and amortization have accrued to reduce the cost account. Inflation must surely have become very efficacious as a neutralizer for the factor of the 45 year old "write-up." The fictitious and unsound asset value is now of dubious survival. The customers as to rates of service, the investors in respect to security and the public have a clear interest in the sound prosperity and compatible expansion of the utility. Just rates ultimately affect service and costs. The consumers' interest can be fairly harmonzed with the investors' here. A formalistic judgment upon the segregated write-up is not a fair compliance with the letter or spirit of the Legislative act. It is a kind of censure in its application here and could now serve little purpose save as a dooming for remote acts committed by outside parties before

Central Maine Power Company secured leave to purchase the controversial properties. We believe that the Company is entitled to the inclusion of the excess acquisition cost of $1,095,194.09 with any proper adjustments in the rate base and that the suspension of that amount under the circumstances must be considered exceptionable and unlawful.

## NORTH GORHAM, WEST BUXTON and BONNY EAGLE HYDRO STATIONS

The Commission suspended from the items composing the Company's proposed rate base an inclusion of three properties which formerly were owned by Cumberland County Power and Light Company (C. C. P. & L. Co.) and which the Central Maine Power Company acquired when it assimilated by merger the assets of C. C. P. & L. Co. in 1942. Those properties are the North Gorham Hydro Station, the West Buxton Hydro Station and the Bonny Eagle Hydro Station and collectively are listed at the cost of $2,239,918.04.

The merger of 1942 was consummated by the Securities and Exchange Commission (S. E. C.) functioning under the authority of the Public Utility Holding Company Act of 1935 (U. S. C. A., Title 15, § 79) and the commerce clause of the U. S. Constitution. The Company and C. C. P. & L. Co. were in 1942 subsidiaries of New England Public Service Company (N. E. P. S. Co.) of which S. E. C. had jurisdiction. S. E. C. was then in the process of reorganizing and simplifying the N. E. P. S. Co. system. An application had been presented to S. E. C. for the merger of C. C. P. & L. Co. into the Central Maine Power Company. The S. E. C. granted the application and by its order fixed and recited the consideration whereby the Company should purchase and C. C. P. & L. Co. should sell to the Company the assets, subject to the liabilities, of C. C. P. & L. Co. The North Gorham, West Buxton and Bonny Eagle prop-

erties were among those assets of C. C. P. & L. Co. The price to the C. C. P. & L. Co. was an aggregate one. Some intangible and inflationary items had been eliminated by the S. E. C. The S. E. C. approved the kind and amount of securities which the Company should issue to finance the merger. The S. E. C. required the approbation of the merger by the Maine Public Utilities Commission in compliance with Maine law. A consolidated actual and *pro forma* statement of both the assets of C. C. P. & L. Co. and of the Company as of July 1, 1942 is appended to the findings and opinion of the S. E. C. in the merger record.

The Maine P. U. C. in approving the merger of C. C. P. & L. Co. into the Company in 1942 ordered that pursuant to the merger the Company

> " - - - shall enter the accounts of Cumberland County Power and Light Company upon its books at the amount shown by the books of Cumberland County Power and Light Company as of July 31, 1942. - -"

The wherefore of the Public Utility Holding Company Act which created the S. E. C. is told in Title 1, Section 1 of the Act. U. S. C. A. Tit. 15, § 79 a (b) (1). In reciting the old law, the mischief and the remedy the statute relates some evils to be alleviated by the S. E. C.

> "(b)   ---it is declared that the national public interest, the interest of investors in the securities of holding companies and their subsidiary companies and affiliates, and the interest of consumers of electric energy - - - are or may be affected,
> - - - - - - - - - - - - - - - - - - - - - - - - -
> "(1)   when such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties and upon the basis of paper profits from inter-company transactions."

The S. E. C. found that the merger of the two subsidiary utilities, C. C. P. & L. Co. into Central Maine Power Company:

" - - - will make certain operating economies possible" and "will serve the public interest by tending towards the economical and efficient development of an integrated public utility system."

The S. E. C. in its exercise of jurisdiction over the merger was *without authority to act* wherever it found that:

"(b)

"(2) in case of the acquisition of securities or utility assets, the consideration, including all fees, commissions, and other remuneration, to whomsoever paid, to be given, directly or indirectly, in connection with such acquisition is not reasonable or does not bear a fair relation to the sums invested in or the earning capacity of the utility assets to be acquired or the utility assets underlying the securities to be acquired; or

"(3) such acquisition will unduly complicate the capital structure of the holding-company system of the applicant or will be detrimental to the public interest or the interest of investors or consumers or the proper functioning of such holding-company system."

Public Utility Holding Act, 10 (b) (2) (3); U. S. C. A., Tit. 15, § 79 j, (b) (2) (3).

The S. E. C. possessed the following powers:

"(e) The Commission, in any order approving the acquisition of securities or utility assets, may prescribe such terms and conditions in respect of such acquisition, including the price to be paid for such securities or utility assets, as the Commission may find necessary or appropriate in the public interest or for the protection of investors or consumers."

Public Utility Holding Act, 10 (e); U. S. C. A., Tit. 15, § 79 j (e).

This court in *Woodsum* v. *Portland R. R. Co.*, 144 Me. 74 commented upon the nature and scope of the Public Utility Holding Act and its administration by the S. E. C., as follows:

P. 79 "- - - an overriding federal law. - - - It is therefore apparent that this court is being invited to take action which may well be in disregard of that delicate balance between state and federal power on which our system of government rests. P. 91 - 92." There can be no question of the right of Congress under the commerce clause of the constitution to bar any action by the state inconsistent with the full and plenary exercise of the authority given to the federal government in a particular field. This is made clear in the case of Schwabacher v. United States, supra. (334 U. S. 182) Both the majority and minority opinions agree that Congress has such power. In matters within its scope, a federal law is supreme.

*Harvey* v. *Rackliffe*, 141 Me. 169, 41 A. (2nd) 455, 161 A. L. R. 296.

"It was the avowed purpose of the Public Utility Holding Company Act to compel the simplification of the structures of holding company systems throughout the United States. To effectuate this purpose, the S. E. C. was given wide powers which it could exercise in carrying out the policy of the Act without regard to the wishes of stockholders and in spite of charter provisions. The so-called death sentence clause meant that the Commission could compel the dissolution of a company whenever necessary to carry out the congressional mandate, and could take complete control of all of its assets.

P. 97. " - - - When the Commission assumed jurisdiction, the power of the state court to take any incompatible action was gone - - -"

When S. E. C. in 1942 ordered that the Company acquire by merger the assets, encumbered by the liabilities, of C. C. P. & L. Co. at a specific consideration, compliance with

that decree was an officially commissioned purchase at an acquisition cost authoritatively prudent. That deduction is unassailable and incontrovertible because of the jurisdiction in the subject matter and proceeding and the broad control enjoyed by the Federal agency which prescribed the price paid. The very action of the S. E. C. presupposes that the price it fixed was adjudged prudent by it. The Company gave the consideration in full and it is operating the Bonny Eagle, West Buxton and North Gorham hydro stations which are necessary to the public service of that utility.

It may be observed cumulatively that in the record of this case is contained evidence that two experts acting independently and contemporaneously with the merger, for a trustee bank appraised the value of the C. C. P. & L. Co. properties. Their judgment is commensurate with the price finding of S. E. C.

Upon the record the cost of the hydro station properties when first devoted to public use appears to be a fact lost beyond evidential recall. But, as we have seen, there is conclusive proof of the prudency of the entire and composite acquisition cost of the C. C. P. & L. Co. assets when purchased in 1942 by the Company. There is evidence available of the costs allocable in the merger of 1942 to the three properties in question.

The Commission therefore erred in dispensing with such evidence of the prudency of the acquisition cost which was paid. There is no evidence of private speculation on the part of the Company here. Fictitious value is eliminated. The legality of the acquisition is beyond question. The properties are in public use. The customers, we must assume, were adequately considered by the S. E. C. They are being served by the properties. The investors have advanced their funds with authoritative sanction. To deny a return on these

properties at their acquisition cost under the circumstances would constitute confiscation. The action of the Commission was exceptionable and unlawful. The prudent acquisition cost of the three properties less depreciation must be added to the Company rate base with any proper adjustments.

## ROBINSON LAND COMPANY

Robinson Land Company was created in 1909 and throughout its existence, until 1923 was controlled by Central Maine Power Company. 600 shares of the Land Company stock were issued for no revealed consideration to Central Maine Power Company and the balance of 400 shares to "the Robinsons." We are informed that "the Robinsons owned the key land and water rights at the site of the Wyman project." One Kelleher was related to the Robinsons and he seems to have received the 400 shares of $100 par value stock. All the while, from 1909 until 1923, the 4 directors of Robinson Land Company were also directors of Central Maine Power Company. In 1910 Kelleher became a director of Central Maine Power Company and in 1921 was a director of both the Land Company and of Central Maine Power Company.

C. M. P. Co. advanced moneys to the Land Company which purchased property. Prior to 1921 C. M. P. Co. had paid $126,355.61 to the Land Company. In 1921 C. M. P. Co. disbursed to the Land Company $80,000 which the latter in turn gave to Kelleher for his minority stock holding of 400 shares in the Land Company. When we subtract $15 representing an account receivable of the Land Company collected by C. M. P. Co., C. M. P. Co. appears to have spent $206,340.61.

On hearsay it is said that Kelleher in 1909 had supplied to Robinson Land Company options on "the Robinson Farm which was at the key site of the Wyman Dam" in exchange for the 400 shares of stock.

It appears in an exhibit prepared by C. M. P. Co. and entered here by the State that by deed of Hadassah S. Robinson dated October 30, 1909 real estate of the Wyman Hydro Development was conveyed to Robinson Land Company at the purchase price of $15,000.

It is not comprehensible from the evidence how much Robinson Land Company real estate is in the rate base presented by C. M. P. Co., how much of it has been released, where the presently operating portion of it lies or when such land was first devoted to public service. C. M. P. Co. carries the real estate in its application at $190,898.18 of the $206,340.61 spent.

C. M. P. Co. has possession of the Robinson Land Company records. Any options exchanged by Kelleher for his stock are not in the record of this case. The payment by the Land Company of $80,000 to Kelleher appears in the exhibit here only as a cash outlay for capital stock and as an acquisition cost to C. M. P. Co.

On July 14, A. D. 1921 the Public Utilities Commission granted the petition of C. M. P. Co. to issue bonds against capitalized properties. A plant account in support of the petition was:

> "Cost of property and power of Robinson Land Company, that part not previously owned and now purchased *$206,355.61.*"

The P. U. C. order did not limit the powers of the P. U. C. for rate fixing. P. L. 1913, c. 216.

This particular issue and business must be distinguished from the problems of the Androscoggin Electric Company and Cumberland County Power & Light Company properties in that the Robinson Land Company additions were controlled and governed by the Central Maine Power Company throughout. In the Androscoggin and Cumberland

matters Central Maine Power Company's role was confined to the aftermath of the alleged transgressions.

The Company upon this topic had been extended fair and timely notice by the Commission that the Robinson Land Company transactions must be clarified. The Company had assumed the onus of proof. The Commission is justified in its finding that the Company has not demonstrated the original cost or the reasonable value of the Robinson Land Company's properties used or required to be used in public service by the Company. The suspension of the item of $190,818.18 from the rate base is neither exceptionable nor unlawful.

## HARRIS STATION, RIPARIAN LANDS

In the time span from 1919 to 1951 the Company acquired from top of bank to stream on both sides of the Kennebec River all the riparian lands with their appurtenant easement water rights through a distance of 12 miles from Indian Pond to The Forks. The Company thereafter built the Harris Station at Indian Pond with an outlay of some $20,000,000. That station is operated as a peak plant which is one designed to function whenever the demand upon the utility system for electric energy is abnormally acute and must be for limited periods of time compensated by some emergency facility. The station was performing in public service during the test year.

In its requested rate base the Company included those riparian lands and water easements at their cost of $543,338.66. The Commission found that such property was not "used or required to be used" in the Company's service to the public and suspended such cost from the rate base conceded. R. S., c. 44, § 18, as amended.

The recorded testimony in support of the Company's premises was invited and elicited by the State's counsel

through the calculated venture of cross examining the Company witness. Such evidence is now disparaged in the Commission decree and in its brief. The testimony is refuted as inconsiderable in that the witness had not qualified as an hydraulic engineer competent to attest to the requirement of the riparian lands and easements for utility operation. The witness had narrated his personal history as Chief Accounting Officer of the Company from 1935 to 1945 and as Controller of the Company since 1945. Obviously he was a man of superior talent, of achieved status and by his significant office in a large utility inferentially a person of extensive information concerning Company affairs. His testimony was unchallenged, unrebutted, plausible and relevant.

> "---- Evidence, even though legally inadmissible, received without objection, is regarded as in the case by consent, and, if relevant, must be considered by the trier of the facts. Moore v. Protection Insurance Co., 29 Me., 97; Brown v. Moran, 42 Me., 44; Tomlinson v. Clement Bros., Inc., 130 Me. 189."

*Watkins Co.* v. *Brown*, 134 Me. 473, 474.

The witness related that the worth to the Company of Harris Station is attributable to its character as a peak plant. As a run-of-the-river station its potency would be restricted to 10,000 kilowatts instead of the 75,000 kilowatts ability it now possesses and it would not be commercially gainful because of its capital cost. It has merited well for the Company but its very advantages were attained only after the resolution of serious problems encountered.

As the need for added power manifests itself upon the lines of the Company an automatic apparatus within 10 seconds releases dam water and spins the generators at Harris Station. The occasioned hydro flow will vary with the hour, the season, the level of the river and the wanted

electric energy. The alternation of storage and discharge of water affects the river flowage in a volume range from 140 to 8000 cubic feet per second. The release of water raises the level of the river to a maximum of 10 feet. The channel of the river from the station to The Forks is not of uniform width and "there is quite a substantial fall in the river." Before the station was constructed legal counsel advised the Company to purchase the controversial riparian lands and water rights and that was done "at the minimum price necessary."

The Kennebec River from Indian Pond to The Forks is non-tidal and floatable.

Riparian ownership extends to the thread of the stream and includes a right to the natural flow of the river with the reasonable and private use and benefit of it subject only to the public right of passage for fish and for boats and logs when the stream is naturally of sufficient size to float boats or logs. The riparian proprietor may use the power for manufacturing and industrial purposes if the water is not thereby unreasonably detained or essentially diminished. He may build dams on his land subject to the provisions of the Mill Act and to the payment of damages for all flowage caused. The proprietor may not unlawfully or unreasonably divert the water. Opinions of the Justices (1920), 118 Me. 503, 506.

As to the relation of riparian owners and downstream proprietors we quote from precedents of this court:

> "The defendants caused an unnatural accumulation of water in a reservoir above the mill of the plaintiff. *If accumulated rightfully as to this plaintiff, they must at least exercise ordinary care in letting it again pass into its ordinary and accustomed channels over the plaintiff's property.* (Emphasis added.) If accumulated wrongfully and without any right or authority as against this

plaintiff, if he lets it into its ordinary, and accustomed channels, he does so at his peril, and he must be held responsible for the consequences of his *wrongful* act."

*Frye* v. *Moor* (1866), 53 Me. 583, 584.

" - - - For only he can recover damages under the mill-act 'whose lands are damaged by being flowed by a *mill-dam'*, R. S. c. 92, § 4. This language, especially when considered in connection with other provisions of the chapter, evidently refers to lands flowed by water raised by the dam, and situated *above* the dam - - - Damages caused by water let out of the dam is nowhere hinted at in the statute. If the dam is rightfully built, the statute provides the remedy for persons injured in their lands by flowing caused thereby; *but the water thus rightfully accumulated must be let out with ordinary care, or the party will be liable at common law for negligence.* Frye v. Moor, 53 Me. 583."

*Wilson* v. *Campbell* (1884), 76 Me. 94, 95. (Emphasis supplied.)

"It must be remembered the case at bar is not a complaint for flowage under the statute. The mill act of this State, unlike that of Massachusetts, does not authorize a complaint for flowing lands below the dam. Wilson v. Campbell, 76 Maine, 94. *The case at bar is an action at common law to recover damages for wrongfully increasing the volume of the stream so as to overflow its banks and the plaintiff's meadow.* Whether or not there was an unreasonable exercise of the defendant's rights under all the circumstances of the case, was a question of fact for the determination of the jury under proper instructions - - -" (Emphasis added.)

*Barker* v. *French* (1907), 102 Me. 407, 413.

" - - - He (the riparian proprietor) may use it for hydraulic purposes, but may not unreasonably retard its natural flow, *nor injuriously accelerate its*

*motion, by discharging it from his works in an unreasonable manner, nor suddenly and in excessive quantities,* nor divert it from its accustomed channel without returning it to the same before it passes from his own premises to those of others - - -" (Emphasis added.)

*Davis* v. *Getchell* (1862), 50 Me. 602, 604.

The above authorities would seem to afford sound apprehension to upstream riparian proprietors against the common law hazards of operating a peak plant which liberates water downstream suddenly and sporadically in large volume.

In 1714 the Province of Massachusetts Bay enacted a mill act. (Province Laws, Chapter 111.) In 1821 Maine adopted one, Laws of Maine, 1821, Chapter XLV. (c. 74, Mass. Laws of 1796.) In R. S., 1841, c. 126, §§ 1 and 2 will be found the substance of our present statutory provisions pertinent here. *Bean* v. *Cent. Me. Pr. Co.* (1934), 133 Me. 9, 13, 14; *Brown* v. *DeNormandie* (1924), 123 Me. 535, 539.

"Sec. 1. Any man may on his own land erect and maintain a watermill and dams to raise water for working it, upon and across any stream *not navigable;* - - - (emphasis added).

"Sec. 3. No such dam shall be erected or canal constructed to the injury of any mill or canal lawfully existing on the same stream; nor to the injury of any mill site, on which a mill or milldam has been lawfully erected and used, unless the right to maintain a mill thereon has been lost or defeated."

R. S., c. 180, §§ 1, 3.

The Mill Act applies to reservoir dams as well as working dams, *Brown* v. *DeNormandie*, 123 Me. @ 542, but regulates only non-navigable, non-tidal streams such as the Kennebec River between Indian Pond and The Forks.

This court said in *Bean* v. *Central Me. Pr. Co.* (1934), 133 Me. 9, 26:

> "In Maine, litigation over rights in water powers began soon after the establishment of the state, and the principle was announced by our court in 1832 that the right of the owner of an undeveloped mill site is not complete. *As against the owner of a lower site, the right to develop and use the upper is suspended, if the lower is first developed and flows the upper site, suspended so long as by the use of the lower site the other is submerged.* 'A mill privilege, not yet occupied is valuable for the purposes to which it may be applied. It is property, which no one can have a legal right to impair or destroy, by diverting from it the natural flow of the stream, *although it may be impaired by the exercise of certain lawful rights, originating in prior occupancy.*'
>
> Blanchard v. Baker, 8 Me. 253, 268." (Emphasis added.)

Applying the Mill Act in 1850 the court ruled:

> " - - - The plaintiff's mill was lawfully existing upon the river, and the erection of the dam by the defendant, some ten rods above it, caused an injury to the mill, by directing the water, in violation of this statute."

*Thomas* v. *Hill*, 31 Me. 252, 254.

In *Wentworth* v. *Poor* (1854), 38 Me. 243 this court held that the owner of a mill erected two rods upstream subsequently to one lawfully existing upon the same stream was liable in damages if by his mode of using the water, the first mill was rendered less beneficial and profitable than it had been before and that such liability was not lessened because the damages were occasioned from the use of improved machinery by the owner of the new mill.

In *Bean* v. *Cent. Me. Pr. Co.*, *supra*, our court chose a felicitous adjective when it qualified the riparian right to

an upstream and undeveloped mill site as "defeasible." 133 Me. @ 21. Purposing as it was to invest vast sums in an upstream peak plant the Company would have been much less than ordinarily prudent in view of the venerable Mill Act and the state of the common law if it had not preempted intervening downstream rights as its counsel had advised. The Company could have been flowed out of its site before it got its station erected. It could continuously worry about law suits and injunctions. Nor in the light of the testimony can we fairly say that the Company has not established that it was justified in the extent of its purchase of land and rights or in the cost "at the minimum price necessary to accomplish the results we sought to accomplish."

It is our conclusion, therefore, that the action of the Commission was exceptionable and unlawful. The riparian lands and water easements at the cost of $543,338.66 subject to any proper adjustments should have been admitted to the rate base as property "used or required to be used" in the public service.

## WORKING CAPITAL

In its rate base the Company solicited an allowance of $4,630,000 for working capital. The Commission approved only $1,000,000. The variance of $3,630,000 consists almost entirely of two particulars, materials and supplies and income tax accruals.

The Company computed its normal average of materials and supplies at $3,246,000. By election it has been the practice of the Company in its official reports to the Commission to post initially all materials and supplies in one account which contains both such chattels as are used for repairs and minor maintenance and also those which are for construction. The parties here stipulate:

"Except for a special case of a special job, all materials pass through the M. & S. account."

As materials and supplies are consumed in construction interest is accredited to the Company upon their cost which is thereafter imbedded in the capital construction account. Such materials and supplies as are expended for repair and minor maintenance are traditionally classified as part of the operating charges to be defrayed from working capital in the rate base. The kind and amount of materials and supplies for repairs occasioned by attrition or emergency are to be ascertained from the reasonable and prudent requirements of operation.

We quote from the record a part of the cross-examination of the Company President:

"Q. Now, one thing that is possible in this material is that some of it may at times be required for minor replacements and repairs, is that correct?
"A. Yes.

"Q. Now is it possible that some of this material may also be used for extensions, that is, for capital additions or construction?
"A. Yes.

"Q. Now, could you tell us approximately how much of the materials here are used for maintenance and operation of the Company, that is, normally, and what portion would be used for construction purposes?
"A. Well, I believe from the working papers supplied, if that is the nature of your question, it was stated that 10% of the issues were charged to operation and maintenance. Does that answer the question?

"Q. I think it does if it answers it, does that mean 90% approximately would be for construction, new construction or otherwise?
"A. Well, that is what that division would show, that 90% of it is charged to construction. But going back to the purpose of the inventory and the

need for it, that is an entirely different and separate thing.

"Q.  Why is that?

"A.  Because the fact that this is a common pool with construction does not necessarily mean that your need for that working capital to sustain and maintain your service is in that ratio.  We have to be in a position to maintain our plant, and that is no measure of the materials and supplies necessary to maintain our plant.  It can't be done on a pro rata basis.

"Q.  It is not possible to break it down exactly, is that right?

"A.  Oh, no, it doesn't lend itself to that kind of treatment at all.  It must be obvious that if we have a severe storm, with service to maintain, that we couldn't get along with 10% of that inventory, for example.

"Q.  Well, you might not be able to get along with it, but you can break down what portion goes to routine operation and maintenance and what portion would go to construction, is that right?

"A.  Well, under normal conditions I think the 10% indicates all that common pool actually uses. But that is no measure of the working capital that we have to tie up irrespective of the capital construction."

The same witness in redirect examination stated:

"A.  Well, regardless of what use is made of this common pool, the fact remains that this amount of materials and supplies is necessary to insure the maintenance of service.  While it remains in M. & S. it is not being carried by construction as subject to interest during construction and is definitely a money lock-up or true working capital as far as Central Maine Power Company is concerned.

"Now, the question has been directed as to what part comes into consideration and what part is

used for maintenance. I repeat that that is a common practice with practically all utilities to run the requirements out of a common pool, but the actual use made of it is insignificant as relating to the main point of a capital tie-up working cash requirement to maintain service, and that is what we are obliged to do and, I am sure that is what the Commission should support us in. And the fact that whether it comes into a capital job, which easily is maintenance in another form, makes no essential difference. It is a tie-up of cash for which we are receiving no recognition whatsoever either through interest during construction, it is simply a tie-up of cash and thereby working capital.

"I know that most utilities operate in this manner, using the common pool. - - -"

Abridged, the deduction of the Company is that its funds have been disbursed for materials and supplies, that it has a right to demand an uninterrupted return on such moneys although the most by far of the materials and supplies are destined for construction and that therefore the entire inventory must be placed in the rate base. The *non sequitur* here is obvious.

The fair, expressed meaning of the quoted testimony is that an average 10% of the materials and supplies may be expected to become diverted to repairs and minor replacements, that 90% will ultimately be issued from the inventory for construction but that the vicissitudes of weather further require that a large stock of articles be constantly stocked against emergencies. This last element is indefinite without the benefit of any commitment or estimate. The Company serves a great area with extensive properties and a far reaching mileage of fixtures. The exposure is wide. The materials and supplies must be distributed and stored.

The Company brief has devoted extended argument to the necessity of an abidingly large inventory contained in the rate base to the amount requested of $3,246,000. But

the Company which bears the burden of proof has afforded no substantial evidence of past average needs, of empirical history or of foreseeable requirements to permit demonstrable fact finding. Improvisation or conjecture is improper and illicit. The Company request is clearly unreasonable but by how much? The Commission availed itself of the concrete figure of 10% and then supplemented its final working capital finding by an addition of $80,900 to yield a round $1,000,000 after disallowing $2,921,400 of the materials and supplies inventoried.

The Company by commingling all materials and supplies in one account compounded the problem. It defended itself upon the grounds of economy and efficiency and pleaded its inability to clarify the situation further. The magnitude of the discrepancy between the amount asked and the $1,000,000 allowed together with the smallness of the percentage of the working capital fixed with relation to the whole rate base is arresting and has given the court much concern for want of tangible and satisfying data.

The Company holds that the amount of materials and supplies for insuring maintenance of the Company's service to the public is a matter of managerial discretion. But for rate-making purposes the Commission has the duty and the correlative right to study such property, to judge if it is *"used or required to be used"* in the public service (R. S., c. 44, § 18), and to determine if the amount approximates the average needs of the Company. *Diamond State Telephone Company* (1954), 48 Del. 317, 103 A. (2nd) 304.

> "Working capital is allowed as a part of the rate base, upon which a reasonable rate of return must be allowed, when it is demonstrated by *substantial* evidence that the utility must provide cash from its own funds to meet necessary operating expenses- - - -" (Emphasis added.)
>
> *Re Transcontinental Gas Pipe Line Corp.* (1952), 94 P. U. R. N. S. 333, 341.

For necessary working capital there is no fixed or conventional percentage or formulary applicable generally to utilities. Fixation depends upon the factual circumstances in each case. *City of Pittsburgh* v. *Penn. P. U. C.* (1952), 370 Pa. 305, 88 A. (2nd) 59, 62.

Because of our conclusions as to the propriety of the incorporation of certain disallowed properties in the rate base and the added necessity for their maintenance and because of the gravity and inadequate status of the materials and supplies issue here it is our opinion that the subject be remanded to the Commission for further hearing and determination in the light of further evidence to be supplied by the Company.

The Company suggested a deduction of $1,995,000 in its working capital computation as a concession and allowance for the minimum balance of accrual for Federal income taxes in the test year. The exhibit prepared by the Company and introduced by the State lists the actual amounts of the 12 monthly balances of accrual for such taxes during the year 1958. The Commission ordered a deduction of $2,773,090 as the 12 months' average rather than the minimum balance deduction proposed by the Company. The Commission's figure is greater by $778,000 than the Company's. The differential is substantial but justified. We find no error there.

## WESTON STATION

At Weston Station in Skowhegan the Company in 1958 stabilized the power house whose foundation structure had moved or slipped. The cost was $271,425. The Company contends that such an amount should be allowed to it as the hydro maintenance expense of Weston Station for the test year, 1958. The Commission, however, granted for Weston Station in the test year formalizing only the average

amount spent for maintenance of Weston during the 5 years (1953-1957), prior to 1958 or $32,343. The result is a subtraction of $239,082 from the Company's requisition.

The theory of the Company is that the work performed at Weston was a maintenance repair rather than construction or replacement. The Company relates the number and kinds of its large and multiplied properties which are imposing and argues that by the rule of probabilities somewhere at least, each year a major repair or stabilization may be expected to supervene and that the expense will be fairly comparable with that at Weston.

The Commission rejoins that the restoration at Weston was abnormal, non recurrent and of a replacement nature without significance in maintenance expense for rate making. It says that through the years from 1949 through 1958 the Weston, 1958 outlay is the largest for maintenance at any plant of the Company, regardless of age or size.

Through the span from 1949 through 1958 it is true that at irregular and desultory times several stations individually required large and acute maintenance or rehabilitation expenditures but the peak maintenance expense of none of these stations except that at Weston is charged to the particular station upon the 1958 test year maintenance roll. As for Weston Station it is not foreseeable that a comparative disbursement for structural correction will be occasioned in the imminent future.

The Company protests that the Commission is here unjustifiedly normalizing a particular station rather than all stations collectively, for a test year.

The restoration expense in 1958 at Weston is egregious. A 5 year (1953 - 1957) average allowance for 1958 test year maintenance of that station seems rational and rightful. Assuming without deciding that the project at Weston

was a maintenance repair and not a capital replacement, inclusion of that cost in the test year maintenance for that particular station is not tenable.

> "During the year under consideration there were charged into operating expenses of the Railway & Light Company $3,444, of expenses connected with dismantling certain primary lines of the Georgia Public Service Corporation and transferring the current distribution to the primary lines of the Railway & Light Company. If a proper charge to operating expenses, this was an extraordinary expense which will not again be incurred, and this year's operating expenses will be saved that sum"

> *In Re Macon Railway & Light Company* (1915), P. U. R., 1915 E. 648, 658.

The Company has the burden of proof. If from its past experience of erratic exposure to major repairs at scattered times there is afforded some over-all calculable annual average of extraordinary repairs it is the responsibility of the Company to supply any such additional data and pattern to the Commission in its test year normalization.

There was no error or inequity in the Commission ruling.

## HYDRO MAINTENANCE EXPENSE

The Company from a record exhibit supplied by it lists the annual hydro maintenance costs experienced by it through the period from 1953 through 1957, which yield an annual, average figure of $543,215. The Company cites the amount of $742,820 as its 1958 actual hydro maintenance expense and subtracts from it the $239,082 disallowed from the Weston Station 1958 expenditure. The difference of $503,738, the Company complains, is its allowance from the Commission for 1958 hydro maintenance expense and is $39,477 less than its average hydro maintenance allowance for the 5 years, 1953 - 1957.

The Commission, however, has allowed to the Company an overall maintenance expense for 1958 of $3,056,000 as requested by the Company less the $239,082 Weston Station disallowance or a net $2,816,918 which exceeds the overall maintenance expense for 1957 by $328,918, is greater than that overall expense for any year from 1951 through 1957 and exceeds the average of those years by $437,318.

## GENERAL and ADMINISTRATIVE EXPENSES

Many of the personnel of the Company are appointed as the need occurs to the furtherance of some of the multiple aspects, engineering and clerical, of construction projects. Prior to 1958 it was the accounting practice of the Company to allocate to construction expense an additional 3% which was thus capitalized to include the overhead for such personnel. Since the test year 1958 that percentage has been lessened from 3% to 2% to compensate for the reduction in construction activity. During the years 1954 through 1957 construction expenditures were high and reached their zenith in 1957. Since the completion of the new and immense steam generating plant at Cousins Island there has been an apparent respite.

|  | Construction Expenditures | General Administration Allocated to Construction |
|---|---|---|
| 1948 | 13,682,821.50 | 183,843.28 |
| 1949 | 9,423,982.59 | 193,857.63 |
| 1950 | 7,892,446.64 | 158,713.94 |
| 1951 | 14,929,361.47 | 248,848.13 |
| 1952 | 14,298,733.47 | 296,439.38 |
| 1953 | 14,858,892.54 | 291,379.86 |
| 1954 | 17,233,539.41 | 320,692.10 |
| 1955 | 17,889,302.04 | 361,262.86 |
| 1956 | 16,281,284.09 | 272,346.56 |
| 1957 | 20,689,395.18 | 413,872.46 |

| | | |
|---|---|---|
| 10 year average | 14,717,975.89 | 274,125.62 |
| 5 year average | 17,390,482.65 | 331,910.77 |
| 3 year average | 18,286,660.43 | 349,160.63 |
| 1958 Test Year | 11,912,386.40 | 95,122.50 |

The testimony of the Company is that for 1959 it purposed and planned to spend only an actual $10,775,000 "mainly substation, transmission, distribution items made up of that nature, plus possibly some preliminaries on generation." "We do not propose to add to our generating capacity in 1959 or 1960." "- - - according to growth trends the Company should be able to take care of its requirements without the need of further generating capacity up to 1962."

The following colloquy between the Company President and the Commission counsel is in the record:

"Q. Now, as I understand it, Mr. Wyman in your testimony heretofore, you stated that the Company is going to require more capacity of growth in 1961 and '62, is that correct, 1961 and '62?

"A. Capacity, I believe, we are already on record of requiring capacity in the year 1962.

"Q. And I think you have already stated that your construction that is required to meet that capacity will be incurred at least a couple of years before that time?

"A. Oh, there is some lead time to final completion, that is right."

The Commission and the Company have disagreed as to the amount of construction to be postulated during the period for which rates are being defined here and derivatively as to the amount of general and administrative expense to be charged upon construction to the reduction of allowable net operating expense. Sums transferred from general and administrative expense to overhead for construction become a fixed part of operating property cost in the rate base upon which the Company earns a return. Such a transfer to the

property account reduces expenses for a particular year and increases net operating income. When construction is decreased less of the general and administrative expenses are allocated to construction and a lower net operating income results.

The presentment of the Company is that following a period of exceptional expansion ending with 1957 it could have no requirement of additional generating capacity until 1962. Therefore, it testified that for 1958 and at least for a few years to ensue it contemplated and purposed a greatly reduced building program and for the test year 1958 as well as for 1959 estimated the monetary costs. The Company contends with force that the extent of a construction prospectus is a decision for managerial authority in sound discretion. The Company insists as well that it is entitled to credit and benefit for all money legitimately and in good faith spent whether for operating expenses or overhead construction.

The Commission, nevertheless, found the following statistics most persuasive.

|  | Construction Expenditures | General Administration Expenses Allocated to Construction | Net General Administration Expense |
|---|---|---|---|
| 1953-57 average | $17,390,482.65 | $331,910.77 | $1,381,147.37 |
| 1958 actual | 11,912,386.40 | 95,122.50 | 2,197,937.39 |

The Commission concluded:

" - - - We are of the opinion that this exhibit indicates that the year 1958 does not constitute a normal year for testing these expenses.

" - - - We disagree however with the Company's contention that this is a *normal* expense for rate making. It is evident that the major cause of the difference between the year 1958 and prior years as far as this item is concerned, is that the Com-

pany's construction program for the year 1958 was considerably less than the program of prior years. For this reason, we cannot consider the 1958 actual figures for this item as being a proper measure for test year purposes."

The Commission consequently ordered the following adjustment:

| | |
|---|---|
| Actual Gen. Adm. Expense transferred to construction (1958) | $ 95,122.50 |
| Adjustment in 1958 of difference between 2% and 3% | 77,938.00 |
| 1958 Actual Adjusted to 3% basis | $173,060.50 |
| Gen. Adm. Expense transferred to Construction—5 year average | $331,910.77 |
| 1958 Adjusted Above | 173,060.50 |
| 1958 *Less* than 5 year average | $158,850.27 |

The Commission thus increased the Company's *pro forma* 1958 Test Year Net Operating Income by the addition of $158,860.

The volume of actual construction in a Test Year and the planned and projected construction for the immediate and few years to follow upon that time are matters within the rationing and will of the Company management. Those elections are not so amenable to external forces as are some economic quantities in a test year. We have upon record the testimony of the Company executive. The Commission was not distrustful or incredulous but was decided rather argumentatively by the content of the cross examination of the Company President who had conceded that at some "lead time" prior to 1962 construction is indicated and operating expenses must then be reduced by transfer to construction from general and administrative expenses. Acknowledging that such an eventuality is very foreseeable, the occasion of it is in suspension and deferred by a real interim for the span from 1957 to 1960-'61. The action of the Commission

has regulated for a delayed futurity rather than for a Test Year actuality. The Company, we must assume, will report future substantial modifications in its construction program. There are sufficient sanctions written in R. S., c. 44, § 60.

It is our opinion that the adjustment of $158,850.27 increasing the Company's *pro forma* Net Operating Income is exceptionable and inequitable.

## TEST YEAR RECESSION

The last quarter of 1957 was a season of economic recession which faltered on until the fall of 1958 when it terminated. The parties in this case are in accord with such facts and the court is cognizant of them. *Melanson* v. *Reed Bros.*, 146 Me. 16, 22. The Company filed its general rate revision in September, A. D., 1958. Hearings were had until June, A. D., 1959 when the Commission entered its decree.

1958 was adopted by the Company as its test year, i.e. as a recent past period reasonably dependable for affording actual and known operating results to serve with all proper adjustments as controls to assure fair returns to the Company for a future period extending until such time as there should occur severe but unforeseeable disturbances.

A test year draws a draft upon the future. It is an excursion into probabilities. Humanly for want of foreknowledge it is the extent of our capabilities. It is useful if prepared with provident caution.

This court observed in *Central Maine Power Co.* v. *P. U. C.* (1957), 153 Me. 229, 239:

> " - - - First, the experience of the test year should not be cast aside except upon a strong showing of its weakness as a measure for the future - - -"

In the same decision we commented upon judicious adjustments, @ 153:

"- - - To ignore this probability is to defeat the very idea of fixing rates for the future upon intelligent and informed estimates. Why should a probability such as this be set aside in favor of the experience of the test year, which we know with certainty will not be repeated in the future? The experience of the test year is at best a 'guess' for the future. If we can make the 'guess' more in line with the probability, in the long run we will have benefited both public and Company. Much obviously must be left to the sound judgment and experience of the Commission."

From 1930 through 1956 the Company enjoyed an annual increase in total sales of kilowatt hours despite the depression years, two war periods and a variety of economic phases such as a hurricane and a recession. Such growth and trend persisted in 1957 and 1958 but to an abnormally depressed degree. Recovery becomes discernible in late 1958 and endures through the first five months of 1959 when the record in this case stops.

The Company made no adjustment in its test year formulary for the exceptional drop in sales of 1958. As we stated in our decision of 1957, *supra,* this has the indicia of "a strong showing of its weakness as a measure for the future."

The Company President upon cross-examination represented:

"Q. In your pro forma income statement you pro formed water, fuel costs and wage costs, that is correct isn't it?
"A. That is correct.

"Q. You haven't, however, pro formed your 1958 income statement for the recession effect that we see in 1958, is that correct?

"A. That is correct.

"Q. Now, Mr. Wyman, isn't it reasonable to assume that 1959 sales will exceed those of 1958?
"A. Yes.

"Q. Due partly to normal growth of the Company?
"A. Yes.

"Q. Due also to the recovery from the 1957 - 1958 recession?
"A. To a point, yes."

Since the time of the Commission decree we, of course, now enjoy the advantage of the *ex post facto* and historical reality that the recession really ended in the autumn of 1958. Substantially improved business conditions have since obtained.

The public utility consultant specialist by at least 3 tests reached a conclusion that because of the recession and its passage the test year 1958 must be normalized by an addition of some 42,000,000 (plant to sales ratio) to 58,000,000 (straight trend) kilowatt hour sales and $238,000 to $341,000 in net income or $497,000 to $710,000 in gross revenue. The witness calculated and detailed the past annual growth in overall kilowatt hour sales and the net income per kilowatt hour both of which quantities, save for the 1957 - 1958 recession period, were quite constant. To estimate an adjustment he computed the subnormality in typical growth of the test year 1958 and multiplied such an amount by 0.568¢, the conservative net operating income per kilowatt hour accepted by the witness from the Company's own reckoning. He justified his computations by demonstrating that they were reconcilable with what could reasonably be foreseen for 1959.

The issue we now resolve is supremely technical, entails a mass of mathematical tabulations and much close testimony.

It has been extensively and sharply debated by parties and counsel. The State's expert was subjected to a prolonged and encompassing cross-examination. He acquitted himself very proficiently. Multiple variant factors are active in any analysis of the problem, such as rate increases, net and gross operating income, plant investment differential, water conditions, power exchanges, customer categories. The subject matter demands for its comprehension and exposition expert and experienced attention.

> " ---- The so-called fact in the rate cases —'confiscation'— is one of the end products of an intricate web of calculation and rationalization requiring expertness."

70 Harvard Law Review, 952, 980.

After a tedious review of this controversy we are unable to say that the Commission is not amply supported by the evidence and by statutory principle in its normalization of the Company's test year in the nedial and conservative net amount of $300,000. The Commission with its technical competence and specialized knowledge has considered the issue and rendered its decision which we believe is correct and just. Sound judgment was exercised in a complicated problem. There was no error or inequity.

We consider *Public Service Co. of N. H.* v. *State* (1959), 153 A. (2nd) 801, distinguishable.

## DEPRECIATION and AMORTIZATION

Such depreciation and amortization expenses as are affected or occasioned by the conclusions and provisions of this opinion are to be suitably adjusted by the Commission.

The exceptions hereinbefore specifically allowed, viz. in the matters pertaining to Androscoggin Electric Company properties, North Gorham, West Buxton and Bonny Eagle Hydro Stations, Harris Station Riparian Lands (Working

Capital) — Material and Supplies, and (General and Administrative Expenses) — Net Operating Income Addition are sustained.

The petition in equity is sustained. The order of the Commission is hereby modified, amended and annulled to the extent of the inequity and unlawfulness thereof as more particularly detailed in this opinion. The cause is remanded to the Public Utilities Commission:

(1) for inclusion in the rate base of the adjusted acquisition cost of the Androscoggin Electric Company properties so-called,

(2) for like inclusion after allocation, of such cost of the North Gorham, West Buxton and Bonny Eagle Hydro Station properties so-called,

(3) for like inclusion of such cost of the Harris Station Riparian Lands so-called,

(4) for further hearing and determination of the Working Capital issue,

(5) for decreasing the Company's adjusted net operating income by the amount of $158,860,

(6) for whatever adjustments are resultingly necessitated and proper for depreciation and amortization,

(7) for entry of any interim orders which may be fitting and compatible herewith,

(8) for entry of a conclusive order.

Copies of all such orders shall be filed by the Public Utilities Commission with the Clerk of the Law Court in the County of Kennebec within 10 days after the date of the respective order.

The petition in equity is retained upon this docket until final disposition hereof.

*So ordered*